FILED
August 11, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MODULUS FINANCIAL ENGINEERING, INC., MODULUS GLOBAL, INC.,** *Plaintiffs* | § | |
| **v.** | § | **No. 1:24-CV-00362-RP** |
| **NVIDIA CORPORATION,** *Defendant* | § | |

## ORDER AND REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiffs Modulus Financial Engineering, Inc. ("MFE") and Modulus Global, Inc.'s ("MG," and with MFE, "Modulus") motion for partial summary judgment, Dkt. 173; Defendant NVIDIA Corporation's ("NVIDIA") motion for summary judgment as to Plaintiffs' request for legal damages, Dkt. 175; NVIDIA's motion for summary judgment as to Plaintiffs' request for equitable relief, Dkt. 176, and all related briefing. Also before the Court are Modulus's motion to exclude the expert opinion of Itamar Simonson, Dkt. 171; Modulus's motion to exclude the expert opinion of Shawn Olds, Dkt. 172; NVIDIA's motion to exclude the expert opinion of Alexander Clemons, Dkt. 174, and all related briefing.

After reviewing the filings and the relevant law, the undersigned will grant NVIDIA's motion to exclude the lost profits and disgorgement expert opinions of Alexander Clemons and recommend that the District Judge deny Modulus's motion

for summary judgment, grant NVIDIA's motion for summary judgment as to legal damages, and deny NVIDIA's motion for summary judgment as to equitable relief.

## I. BACKGROUND

Modulus and NVIDIA are companies that design software. Dkt. 1, at 2. Though Plaintiffs Modulus Financial Engineering, Inc. ("MFE") and Modulus Global, Inc. ("MG") refer to themselves throughout the briefing as one "Modulus," they are separate companies. *See, e.g.*, Dkt. 190-14 (licensing agreement between MFE, an Arizona Corporation, and MG, a Delaware Corporation). In one form or another, "Modulus" has used the MODULUS marks in commerce since 2002. Dkts. 2; 2-1. MFE registered the marks, Nos. 4,755,560 (the "'560 mark") and 6,624,640 (the "'640 mark"), in 2015 and 2022, respectively. Dkts. 2; 2-1. It then licensed the marks to MG. Dkts. 190-14; 166-9, at 582.

Modulus uses the marks to sell software for building securities exchanges. Dkt. 190-6, at 140-41 (Richard Gardner[1] agreeing that the Modulus Exchange Solution is used to build exchanges). According to Modulus leadership, the software can also be used for other purposes, including "physics-informed modeling," artificial intelligence, and "digital twins." Dkt. 194, at 11-13; *see* Dkts. 166-4, at 150-51 (Jay Gould[2] stating an NVIDIA partner "did a digital twin" using NVIDIA Modulus); 166-6, at 112 (Gardner stating that "[t]here's been a lot" of companies or people who have

[1] Richard Gardner is Modulus's founder and principal. Dkt. 166-6, at 13.

[2] Jay Gould is NVIDIA's Developer Engagement Manager and former Senior Product Marketing Manager. Dkt. 166-4, at 15.

used Modulus's Evo2 software to perform physics-informed modeling, though he could not recall any specific names).

In 2021, NVIDIA chose to change the name of its free physics toolkit, formerly SimNet, to "Modulus." Dkts. 168-10; 190-9 (describing NVIDIA Modulus as "a framework for developing 'physics-grounded' machine learning models in industries that require a high level of physical accuracy"); 169-15, at 86. NVIDIA changed the name of its product from NVIDIA Modulus to NVIDIA PhysicsNeMo in 2025. Dkt. 166-6, at 23. Alleging NVIDIA adopted the MODULUS mark for use in connection with its own technology during the period from 2021 to 2025, Modulus sued NVIDIA for trademark infringement, 15 U.S.C. § 1114, unfair competition and false designation of origin, *id.* § 1125(a), and unfair competition under Texas common law. Dkt. 1.

Modulus moved for summary judgment as to each of its claims and a handful of NVIDIA's defenses, including invalidity, insufficient notice of registration, abandonment, non-incontestability, laches, and secondary meaning. Dkt. 173. Modulus also moved for summary judgment on costs and fees. *Id.* NVIDIA responds that the Court should not only deny Modulus's motion for summary judgment in its entirety but also grant summary judgment in NVIDIA's favor on trademark infringement. Dkt. 224. NVIDIA separately moved for summary judgment on Modulus's request for legal damages, Dkt. 175, and Modulus's requests for equitable relief, Dkt. 176.

Additionally, Modulus moved to exclude the expert opinions of Itamar Simonson and Shawn Olds, NVIDIA's experts. Dkts. 171; 172. In turn, NVIDIA moved to exclude Modulus's damages expert, Alexander Clemons. Dkt. 174.

## II. MOTIONS TO EXCLUDE

### A. Legal Standard

The Supreme Court acknowledged in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597-98 (1993), that Federal Rule of Evidence 702 is the proper standard for determining the admissibility of expert testimony. Under *Daubert* and Rule 702, the district court must act as a "gatekeeper" by ensuring that an expert's testimony rests on a reliable foundation. *Id.*; Fed. R. Evid. 702. Rule 702 provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. "'In short, expert testimony is admissible only if it is both relevant and reliable.'" *Ruffin v. BP Expl. & Prod., Inc.*, 176 F.4th 855, 859-60 (5th Cir. 2026) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). Rule 702 was recently amended to clarify that the proponent of the evidence bears the burden of

demonstrating that an expert's testimony will be both relevant and reliable when it is offered. *See* Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see also Schott v. Bexar Cnty.*, No. 5:23-CV-00706-OLG-RBF, 2025 WL 2375649, at *2 (W.D. Tex. Aug. 14, 2025). "[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Still, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).

## B. Discussion

### 1. The District Judge should exclude Alexander Clemons's opinions.

#### a. Clemons's lost-profits opinions should be excluded.

Modulus has not met its burden to show that Clemons's lost-profits testimony is the product of reliable methods or based on sufficient data. NVIDIA first asserts the Court should exclude Clemons's lost-profits opinions because Clemons relies exclusively on discussions with Modulus's owner, Richard Gardner, to support his assessment of the revenue Modulus would have made but for NVIDIA's conduct. Dkt.

174, at 6-9.[3] Further, NVIDIA argues that Gardner's own projections are speculative. *Id.* at 8-9. Modulus responds that Gardner's predictions are reliable, and Clemons's reliance on them goes to the weight of his testimony, not its admissibility. Dkt. 198, at 3. Modulus adds that though Gardner's projections "may be less robust than other evidence that might be imagined in an ideal scenario, [they are] the best available evidence and should not be discarded merely because [they are] not perfect," particularly given there are no "better or alternative sources for this data." *Id.* at 4-5.

Modulus fails to demonstrate that Clemons's opinions are based on anything more than Gardner's unreliable projections. An expert's testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702(b), (c). "Although an expert can rely on information provided by a party's attorney, an expert cannot forgo [his] own independent analysis and rely exclusively on what an interested party tells them." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 303 (5th Cir. 2024) (cleaned up, internal quotation marks omitted). In *Harris*, the Fifth Circuit held that the district court abused its discretion in allowing a human resources ("HR") expert to testify in an employment discrimination case even though she "conceded that she did not have any knowledge of [defendant's] HR policies and

[3] NVIDIA also argues that Clemons's "supplemental" report assessing the reasonableness of Gardner's representations fails to salvage Clemons's unreliable opinions. Dkt. 174, at 9-11. NVIDIA moved to strike the supplemental report, and the District Judge referred the motion to the undersigned. Dkt. 146. The undersigned granted NVIDIA's motion and struck the supplemental report. Dkt. 200. Therefore, for the purposes of this order, the undersigned disregards the parties' arguments related to the supplemental report.

procedures and that her testimony was based only on her review of [plaintiff's] complaint." *Id.*

Applying this standard, district courts have excluded testimony based on untested facts or data provided to the expert by an interested party. For example, in *Doe (E.M.B.) v. G6 Hospitality, LLC*, the court excluded an expert's opinion because it relied solely on the expert's interview of the plaintiff. No. 9:23-CV-00173-MJT-CLS, 2025 WL 2556106, at *20 (E.D. Tex. Apr. 23, 2025). In *Diabetes Centers of America, Inc. v. Healthpia America, Inc.*, the court excluded a damages expert's opinion regarding lost profits where the expert "conducted no independent research into whether the projected figures given to him by [plaintiff] were valid, or even reasonable." No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008). The court stated that the "Federal Rules of Evidence and the requirements of *Daubert* are not satisfied where, as here, the expert fails to show any basis for believing someone else's projections." *Id.* And in *Stinson Air Center, LLC v. XL Specialty Insurance Company*, the district court excluded expert testimony regarding plaintiff's economic damages where the opinion was "not based on any financial analysis or review of financial data [or] independent review of any cash flow statements, financial statements, or balance sheets," but rather was "primarily based upon conversations with" plaintiff's owner. No. SA-03-CA-61-FB, 2005 WL 5979096, at *3 (W.D. Tex. July 8, 2005). The Court explained that "[b]ecause the opinions given are based solely upon representations of a party with an interest in the outcome of this lawsuit, without

any independent review of ordinary sources of financial analysis," the opinion was "unorthodox and unreliable." *Id.*

Here, Clemons relied entirely on Gardner's projections to formulate his lost-profits opinions. The only projected revenue figures in Clemons's report came from "discussions with Richard Gardner." Dkt. 167-5, at 21 n.108-114.[4] Clemons similarly relies on his discussions with Gardner to support his comments on Modulus's costs insofar as they impact lost profits. *See id.* Modulus asserts that Clemons considered both Gardner's projections and "prior revenue of Modulus," Dkt. 198, at 2, and attempts to distinguish *Diabetes Centers* on the basis that the expert in that case conducted no independent research, claiming Clemons "knew the basis for the projections and considered those projections in the context of past revenue [and] market conditions." Dkt. 198, at 5[5]; *see* 2008 WL 375505, at *2. But Clemons's figures show that he accepted Gardner's "but-for" revenue projections without modification. Dkt. 167-5, at 22.

Modulus also attempts to distinguish *Stinson* and *Doe (E.M.B.)* on the basis that in those cases, there was contradictory evidence in the record which the expert failed to consider. Dkt. 198, at 4-5; *see Stinson*, 2005 WL 5979096, at *3; *Doe (E.M.B.)*, 2025 WL 2556106, at *20. In contrast, according to Modulus, Gardner's projection is

[4] Though Gardner's more conservative revenue estimates for 2023 consider the FTX bankruptcy, *see* Dkt. 167-5, at 21, Clemons's citation to an article discussing the FTX Crypto Exchange collapse generally does not show he relied on facts or data other than Gardner's projections in arriving at his lost-profits conclusions, *id.* at 21 n.108.

[5] The undersigned omits Modulus's reference to reasonableness checks in this sentence. *See* Dkt. 198, at 5; *supra* n.3.

the type of evidence that "cannot be audited or tested." *Id.* at 4. This argument is unconvincing. Regardless of whether the record evidence supported or contradicted Gardner's projections, Gardner and Clemons certainly could have based their revenue projections on more than Gardner's own "back-of-the-napkin kind of calculations and stuff." Dkt. 167-8, at 57. Indeed, they attempted to do so when they offered Clemons's "supplemental" report. *See* Dkt. 200. Finally, the undersigned agrees with NVIDIA that the absence of reliable data does not justify the use of unreliable data. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 445 (S.D.N.Y. 2016) (concluding expert's "lack of access to reliable data does not justify use of unreliable data, and militates against admission under *Daubert*").

Having determined that Clemons's testimony is based on unreliable methods and insufficient data, the undersigned does not reach NVIDIA's other bases for exclusion. Because Modulus fails to carry its burden to show Clemons's lost-profits testimony is reliable, the undersigned will grant NVIDIA's motion to exclude those opinions.

b. Clemons's disgorgement opinions will be excluded.

Modulus fails to carry its burden to show that Clemons's disgorgement opinions are admissible. Clemons posits that because NVIDIA Modulus is marketed as one of 14 or 16 "Tools for AI Development" included in the NVIDIA AI Enterprise ("NVAIE") product, he can calculate NVIDIA's profits associated with NVIDIA Modulus by dividing the NVAIE earnings by 14 or 16. Dkt. 167-5, at 31-32. Among other reasons, NVIDIA asks the Court to exclude Clemons's resulting opinions on the

basis that Clemons "arbitrarily assumes" that each of the NVAIE products has the same value even though the physics toolkit is free. Dkt. 174, at 17. Put another way, if other NVAIE offerings are worth more or less than the physics toolkit, a 14- or 16-way even split would not be a reliable indicator of profits attributable to the physics toolkit. In response, Modulus asserts that NVIDIA carries the burden to show apportionment under the Lanham Act, and evidence relevant to apportionment is in NVIDIA's possession alone. Dkt. 198, at 11.

The undersigned finds that because they are rooted in the unsupported assumption that the physics toolkit accounts for an equal proportion of NVAIE profits, Clemons's disgorgement opinions should be excluded as based on unreliable methods and insufficient data. *See Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 2:15-cv-01366-JRG-RSP, 2021 WL 662237, at *7 (E.D. Tex. 2021) (excluding patent damages expert's apportionment opinion because his assumptions were made "without any support" and were not tied to the facts of the case). Clemons also chooses not to consider facts suggesting that the products may not be valued equally. For example, Clemons himself acknowledges that NVIDIA Modulus is a free product. *See* Dkt. 167-5, at 30 ("I understand that in March 2023 NVIDIA Modulus became open source[.]"). Even if Clemons is right that NVIDIA Modulus continued to be a "selling point" for NVAIE, *id.*, Clemons's failure to consider the impact of NVIDIA Modulus's cost of zero on NVIDIA's *profits* renders his opinion unreliable. Additionally, programs including NVIDIA vGPU and NVIDIA NIMs are available only via NVAIE subscription, suggesting they account for more of NVAIE's sales than the free physics

toolkit. *See* Dkt. 167-21, at 47 (Anders Tjernlund[6] stating that while many of NVAIE's offerings are open source, NVIDIA vGPU and NVIDIA NIM are "only made available for production purposes via NVIDIA Enterprise subscription").

The undersigned rejects Modulus's argument that requiring Clemons to support his apportionment assumption is improper burden shifting. *See* Dkt. 198, at 11. It is true that under 15 U.S.C. § 1117(a) that "the plaintiff has the burden of showing the amount of the defendant's sales of the infringing product" and "the defendant has the burden of showing all elements of cost and other deductions." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 901 (5th Cir. 2016) [hereinafter *Retractable I*] (internal quotation marks omitted). Yet Clemons's choice to ignore facts bearing on his analysis that *are* in the record makes his opinion no more reliable. Clemons's disgorgement opinions will be excluded.

2. The remaining motions to exclude will be dismissed as moot.

Modulus moves to exclude the opinions of NVIDIA's experts Itamar Simonson and Shawn Olds. Dkts. 171; 172. Because the undersigned relies on neither expert's testimony in issuing the recommendation on the motions for summary judgment, the undersigned will dismiss Modulus's motions to exclude, Dkts. 171; 172, as moot.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute

[6] Anders Tjernlund is NVIDIA's Senior Director of Product Management. Dkt. 169-18, at 10.

as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v.*

*Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

On cross-motions for summary judgment, the court examines each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005). Simply because both parties are requesting summary judgment does not mean that the court must grant judgment to one of them. "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law …." *Joplin v. Bias*, 631 F.2d 1235, 1237 (5th Cir. 1980). Each party may move for summary judgment using different legal theories that rely on different sets of material facts. *Bricklayers, Masons & Plasterers Int'l Union of Am. v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975). Nonetheless, cross-motions for summary judgment may be probative of the absence of a factual dispute when they reveal a basic agreement concerning what legal theories and material facts are dispositive. *See id.*

### B. Discussion

#### 1. Neither party is entitled to summary judgment on the claims for trademark infringement or unfair competition under federal or Texas law.

##### a. There is a genuine issue of material fact as to likelihood of confusion.[7]

Modulus asserts that it is entitled to summary judgment because it owns a legally protectable mark and NVIDIA's infringing use of that mark creates a likelihood of confusion based on strength of the mark, mark similarity, advertising similarity, and actual confusion. Dkt. 173. In response, NVIDIA does not contest that Modulus owns a legally protectable mark but argues that Modulus's motion should be denied because it is wrong on the factors it addresses and fails to mention the remaining four. *See* Dkt. 224. NVIDIA asserts that each of the digits of confusion weighs against confusion. *Id.*

The Lanham Act "imposes civil liability on any person who without consent uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely

[7] Because claims for federal trademark infringement under 15 U.S.C. § 1114, unfair competition and false designation of origin under 15 U.S.C. § 1125(a), and unfair competition through acts of trademark infringement under Texas common law have identical elements, the undersigned's analysis of the digits of confusion applies to all three claims. *See, e.g.*, *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 426 (5th Cir. 2021) (stating that the same elements apply to causes of action for infringement under section 32 and section 43); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) ("'A trademark infringement and unfair competition action under Texas common law presents essentially 'no difference in issues than those under federal trademark infringement actions.'" (quoting *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied))).

to cause confusion, or to cause mistake, or to deceive.'" *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 749 (5th Cir. 2022) (quoting 15 U.S.C. § 1114(1)(a)). To prevail on a Lanham Act claim, Modulus must show "(1) ownership of a legally protectable mark and (2) a likelihood of confusion created by an infringing mark." *All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 505 (5th Cir. 2018).

In assessing likelihood of confusion, courts consider eight nonexhaustive "digits": (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers. *Id.* at 508. "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). "Besides being simply examples, those eight digits also are fact-specific and flexible, and no digit is dispositive." *Adler*, 10 F.4th at 427 (internal quotation marks omitted). "Although likelihood of confusion is generally a fact question, summary judgment may be proper if the undisputed facts in the summary judgment record compel the conclusion that the movant is entitled to judgment as a matter of law." *Wilson v. Tessmer Law Firm, PLLC*, 483 F. Supp. 3d 416, 425 (W.D. Tex. 2020) (citing *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 474 (5th Cir. 2008)) (cleaned up).

The facts in this record compel no such conclusion. Both parties have presented competing evidence on the factors, creating genuine issues of material fact and making resolution of the dispute unsuitable for summary judgment. *See, e.g.*, *Rex Real Est. I, LP v. Rex Real Est. Exch., Inc.*, No. A-19-CV-696-RP, 2020 WL 4194016, at *5-6 (W.D. Tex. July 21, 2020). For example, with respect to strength of the mark, courts consider (1) where the mark falls on the spectrum of distinctiveness, where strength increases when moving toward arbitrary marks and (2) the standing of the mark in the marketplace. *All. for Good Gov't*, 901 F.3d at 509. Modulus presents evidence that it has been using the mark for over two decades, a fact that supports strength of the mark. Dkt. 166-6, at 31 (testimony from Modulus's CEO, Richard Gardner, that he began doing business under the name Modulus in 2002). On the other hand, NVIDIA points to evidence that there are 26 trademarks for the name Modulus or variations of it, undercutting Modulus's assertions about strength of the mark. Dkt. 190-50 (showing the results of NVIDIA's trademark search); *see Rex Real Est. I, LP v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 621 (5th Cir. 2023) ("'[A]ll third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak.'" (quoting *Supervisors*, 550 F.3d at 479)).

With respect to mark similarity, Modulus argues that NVIDIA's standalone use of the mark—that is, without an appended "NVIDIA"—is identical to Modulus's mark, demonstrating likelihood of confusion. Dkt. 173, at 5; *see* Dkt. 166-14, at 20 (testimony that "Modulus" is pronounced and spelled the same when referring to

either party's product). But NVIDIA presents evidence that it repeatedly used the descriptor "NVIDIA Modulus" to refer to its product, decreasing the likelihood of confusion. Dkt. 224, at 15; *see, e.g.*, Dkts. 190-16 (NVIDIA webpage titled "NVIDIA Modulus," with later references to "Modulus"); 190-44, at 88 (Bhoomi Gadhia Shah[8] stating that NVIDIA uses the name "NVIDIA Modulus" in its first reference to the product); *Springboards to Educ., Inc. v. Hou. Indep. Sch. Dist.*, 912 F.3d 805, 815-16 (5th Cir. 2019) (concluding Houston Independent School District's use of "Houston ISD" in the mark "mitigates the likelihood of confusion").

The parties also present conflicting evidence as to advertising similarity. "The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Viacom Int'l v. IJR Cap. Invs., LLC*, 891 F.3d 178, 195 (5th Cir. 2018) (internal quotation marks omitted). Modulus presents evidence that it and NVIDIA both use LinkedIn and other platforms to promote their products. Dkts. 166-4, at 325 (stating NVIDIA used LinkedIn as well as other platforms to promote Modulus by NVIDIA); 166-13, at 11 (stating that Modulus posted advertisements on LinkedIn); 190-6, at 706 (stating Modulus has "spent a lot of money," potentially "millions," on social-media advertising, including on Instagram, Facebook, YouTube, and LinkedIn). NVIDIA counters with evidence that the "lion's share" of the parties' advertising takes place on their respective websites, decreasing the likelihood of customer confusion. Dkts. 190-6, at 706-07 (stating Modulus uses pay-per-click

[8] Shah is NVIDIA's Product Marketing Leader. Dkt. 166-11, at 9-10.

campaigns "tie[d] to its websites"); 190-51, at 4 (showing NVIDIA website advertising NVIDIA Modulus).

Finally, NVIDIA comes forward with competent evidence creating a genuine issue of material fact on factors that Modulus failed to address in its motion. For example, NVIDIA presents evidence that Modulus customers undertake a lengthy purchasing process, connoting a high degree of care. Dkt. 224, at 7; *see* Dkt. 190-6, at 233-35 (Gardner explaining that Modulus clients participate in three to four one-hour Zoom meetings before purchasing); *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 458 (5th Cir. 2017) (finding the degree-of-care digit weighed in favor of likelihood of confusion where the equipment at issue was "often purchased through a fairly lengthy and involved process of communication between the buyer and seller").

Because the parties present genuine issues of material fact bearing on the digits of confusion, the District Judge should decline to grant summary judgment in either party's favor on the claims for trademark infringement or unfair competition.

b. Modulus is not entitled to summary judgment on NVIDIA's invalidity defense.

Modulus also asks the Court to grant summary judgment in its favor on NVIDIA's defenses of invalidity, insufficient notice of registration, abandonment, non-incontestability, laches, and no secondary meaning. Dkt. 173, at 17-20. In response, NVIDIA states that it will drop all but its invalidity defense. Dkt. 224, at 19 n.10. With respect to invalidity, Modulus states that there is no evidence Modulus made false statements to the U.S. Patent and Trademark Office ("PTO") to obtain its

mark by fraud, that Modulus abandoned the mark, or that Modulus is generic. Dkt. 173, at 17. NVIDIA counters that there is evidence that MFE abandoned its trademarks "by licensing them to MG without sufficient quality control." Dkt. 224, at 19.[9]

A trademark is invalid if the owner has "abandoned" it. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1078 (5th Cir. 1997). A mark is "abandoned" when "any course of conduct of the owner, including acts of omission as well as commission, causes the mark … to lose its significance as a mark," including due to naked licensing. *Id.* at 1078-79. "Naked licensing," and thus abandonment, can occur when a licensor grants permission to use its mark "without attendant provisions to protect the quality of the goods or services provided under the licensed mark." *Id.* at 1075. The naked-licensing defense is concerned with misleading the public: "[i]f a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device." *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977).

Evidence of an inconsistent level of quality is relevant to whether a party abandoned a mark through naked licensing. In *Taco Cabana International, Inc. v. Two Pesos, Inc.*, the Fifth Circuit determined that two brothers who divided the Taco Cabana restaurants into two groups but allowed the groups to use the same trade dress had not entered a naked-license arrangement because customers could expect

[9] NVIDIA does not argue that Modulus's mark was fraudulently obtained or generic. *See* Dkt. 224.

a consistent level of quality between the restaurants. 932 F.2d 1113, 1121 (5th Cir. 1991). Though the licensing agreement was somewhat unusual, the Circuit stated that

> Where the particular circumstances of the licensing arrangement persuade [courts] that the public will not be deceived, [courts] need not elevate form over substance and require the same policing rigor appropriate to more formal licensing and franchising transactions. Where the license parties have engaged in a close working relationship, and may justifiably rely on each [party's] intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated, we would depart from the purpose of the law to find an abandonment simply for want of all the inspection and control formalities.

*Id.*

Unlike in *Taco Cabana*, NVIDIA presents evidence that, when viewed in the light most favorable to NVIDIA, suggests inconsistent quality between the marks. *See id.* NVIDIA points to emails from customers to Gardner conveying issues with Modulus. *See, e.g.*, Dkts. 167-13; 167-15; 167-16; 167-17. Whether this evidence, considering the unique relationship between MFE and MG, demonstrates MFE engaged in naked licensing is a question for the jury. Further, though Modulus points to evidence contradicting NVIDIA's assertion that the license between MFE and MG lacked quality-control provisions, whether there is a formal contractual right of control is not dispositive. Dkt. 237, at 19; *see* Dkt. 166-39, at 2 ("All intended uses by Licensee of any trademarks … of Licensor that incorporate or are similar to the trademarks set forth [elsewhere in the contract] must first be submitted to Licensor for approval of design, color, and other details[.]"); 2 McCarthy on Trademarks and Unfair Competition § 18:48 (5th ed. 2026) ("[T]he presence or lack o[f] a contractual

right to control is secondary. … Under the modern rule, the question is whether there has been sufficient *actual* control by the trademark owner-licensor over the nature and quality of the goods or services sold by the licensee.”). The District Judge should decline to grant the motion for summary judgment on NVIDIA’s invalidity defense.

c. Modulus is not entitled to summary judgment on NVIDIA’s fees and costs.

Finally, Modulus asserts it is entitled to summary judgment on NVIDIA’s fees and costs because it requested fees pursuant to 35 U.S.C. § 285, which governs the award of fees in patent cases. Dkt. 173, at 20. NVIDIA responds that its request for fees under § 285 was a typographical error that does not deprive NVIDIA of the ability to seek fees. Dkt. 224, at 20.

A prevailing party under the Lanham Act may receive reasonable attorneys’ fees in “exceptional cases.” *See* 15 U.S.C. § 1117. The Fifth Circuit has found that where a plaintiff “put[s] the issue of attorneys’ fees in play by bringing a claim under a statute that permits the prevailing party to recover attorneys’ fees and pleading for attorneys’ fees” and the defendant “informed [plaintiff] that it intended to recover its attorneys’ fees,” the defendant does not waive its right to attorneys’ fees. *Solferini as Tr. of Corradi S.p.A. v. Corradi USA, Inc.*, No. 20-40645, 2021 WL 3619905, at *3 (5th Cir. 2021) (citing *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1240, 1242 (5th Cir. 1984) (concluding that defendant was entitled to attorneys’ fees where the plaintiffs had filed suit to enforce a contract that awarded attorneys’ fees to the prevailing party in any dispute and the plaintiffs pleaded for such fees)).

Here, Modulus filed and requested fees under the Lanham Act. Dkt. 1, at 15. NVIDIA has put forward evidence that Modulus was on notice of its request for fees despite the typographical error. *See, e.g.*, Dkt. 190-54, at 2 (letter from defense counsel stating that "NVIDIA intends to seek its attorneys' fees incurred in its defense of this case."). Though the statute in *Solferini* did not limit an award of attorneys' fees to "exceptional cases," the statute permitted, but did not require, a fee award. *See* 2021 WL 3619905, at *3 (citing Tex. Bus. & Com. Code § 5.111(e) ("Reasonable attorney's fees and other expenses of litigation may be awarded to the prevailing party in an action in which a remedy is sought under this chapter.")). Nor does Modulus argue that this case is unexceptional under the Lanham Act. *See* Dkt. 173, at 20 (arguing that the Court "cannot find Modulus has brought an exceptional patent infringement case under 35 U.S.C. § 285"). And though the defendant in *Solferini* notified the plaintiff that it intended to recover attorneys' fees in initial discovery disclosures, the Fifth Circuit also stated in that case that "notice may be provided in other ways," suggesting pleadings and initial disclosures are not the exclusive avenues for putting a plaintiff on notice of a request for fees. *See* 2021 WL 3619905, at *3. The District Judge should deny summary judgment as to fees.

2. The District Judge should grant NVIDIA's motion for summary judgment as to legal damages.

a. There is no genuine issue of material fact as to whether MFE is entitled to legal damages.

i. Modulus presents no evidence of MFE's lost profits.

NVIDIA asserts there is no genuine issue of material fact as to whether MFE suffered any lost profits. Dkt. 175, at 8. NVIDIA points out that MFE has functioned

as an intellectual-property holding company since 2018 and has not sold any products since that date. Dkt. 168-14, at 2 (noting MFE "was transitioned into an intellectual property holding company around 2018"). Therefore, according to NVIDIA, any lost profits during the damages period of 2023, 2024, and 2025[10] are MG's, not MFE's. Dkt. 175, at 8-9. Indeed, Gardner testified that the revenue he projected Modulus would earn in those years—and which Clemons relied on in his report, the only other evidence of lost profits in the record—was MG's revenue only. *See* Dkt. 168-7, at 420 (Gardner agreeing that "of the revenue that [he] projected to Mr. Clemons for '23, '24, and '25, the intent would be for Modulus Global to recognize 100 percent of that revenue"); *see also* Dkt. 168-6, at 71 (Clemons stating his report does not discuss any royalties between MFE and MG), 72 (Clemons stating, "I haven't further disaggregated that between" MFE and MG). NVIDIA further argues that Modulus's statements from customers Tom Roberts, Chris Bailey, and Jerry LeBlanc regarding actual confusion fail to show lost profits, since no alleged instance of confusion resulted in a lost sale. Dkt. 175, at 5-6; *see* Dkts. 168-6, at 67 (Clemons stating it is "[his] understanding" that "no harm resulted" from Mr. Roberts's and Mr. Bailey's confusion); 168-19, at 2 (email from Gardner stating there was "no damage" as a result of Roberts's alleged confusion); 168-8, at 53 (Gardner agreeing LeBlanc "was not specifically looking to do business with [Modulus] before [an AI model] mistook" NVIDIA Modulus for Modulus).

[10] NVIDIA cites Clemons's report, which calculates damages only for the years 2023, 2024, and 2025, in support of its contention that Modulus seeks damages only for those years. Dkt. 175, at 17; *see* Dkt. 168-5, at 21-22 (Clemons's calculations for 2023, 2024, and 2025). Modulus does not disagree.

In response, Modulus points only to Gardner's testimony, Clemons's report, and its three instances of alleged actual confusion as evidence of lost profits. Dkt. 195. Regarding Gardner's testimony, Gardner admitted that his revenue projections applied only to MG. Dkt. 168-7, at 420 (Gardner agreeing that "of the revenue that [he] projected to Mr. Clemons for '23, '24, and '25, the intent would be for Modulus Global to recognize 100 percent of that revenue"). The Court has struck Clemons's lost-profits opinions.[11] Even if it had not, Clemons's report would be inadequate to support a finding of lost profits for MFE since it relies entirely on Gardner's testimony regarding MG's—not MFE's—projected revenue. *See* Dkt. 168-5, at 21. And Modulus's own evidence demonstrates that Roberts, Bailey, and LeBlanc's confusion resulted in no lost profits. Dkts. 168-6, at 67 (Clemons stating it is "[his] understanding" that "no harm resulted" from Mr. Roberts' and Mr. Bailey's confusion); 168-19, at 2 (email from Gardner stating there was "no damage" as a result of Roberts' alleged confusion); 168-8, at 53 (Gardner agreeing LeBlanc "was not specifically looking to do business with [Modulus] before [an AI model] mistook" NVIDIA Modulus for Modulus). Though these customers' testimony is certainly relevant to the digit of actual confusion, Modulus points to no authority standing for the proposition that these customers' experiences, standing alone, can support an award of lost profits. *See* Dkt. 195.[12] Further, because Roberts, Bailey, and LeBlanc

---

[11] *See supra* Part II.B.1.b.

[12] Not only is the Eighth Circuit's decision in *Masters v. UHS of Delaware, Inc.* not binding on this Court, but the court in that case also asserted that "actual confusion entitles plaintiff to damages" in the context of a discussion on whether Eighth Circuit precedent required a

experienced confusion in 2023, 2024, and 2025, even if their experiences created a fact issue as to whether other, unidentified customers were confused, they do not support the conclusion that the resulting lost profits accrued to MFE instead of MG given MFE functioned as a holding company at that time. *See* Dkts. 168-14, at 12-14 (stating LeBlanc experienced confusion in 2025); 168-21, at 6 (Roberts describing confusion in 2023); 168-22, at 3 (Bailey describing confusion in 2024). There is no genuine issue of material fact as to MFE's lack of lost profits.

ii. MFE cannot recover MG's lost profits as its "alter ego."

MFE cannot pierce its own corporate veil to recover MG's lost profits. Modulus asserts that any evidence of MG's lost profits can be attributed to MFE because MFE and MG are "alter egos" by way of their shared owner, Richard Gardner. Dkt. 195, at 8. Modulus offers no support for its contention that a company can recover damages incurred by its alter ego and has not provided sufficient evidence that MFE and MG are alter egos. And NVIDIA responds that allowing MFE to do so would be inconsistent with Fifth Circuit interpretations of the alter-ego doctrine. Dkt. 221, at 5.

Initially, MFE is likely not MG's alter ego because Modulus makes no allegation that either company owns stock in the other. *See* Dkt. 195, at 3 (stating Gardner "has, at all times, been the sole and complete owner for both MFE and MG"). The Fifth Circuit has stated that "the alter ego doctrine generally applies when a

---

showing of actual confusion to award damages, not whether actual confusion was sufficient on its own to support a finding of lost profits. *See* 631 F.3d 464, 473 (8th Cir. 2011).

party seeks to hold an individual or entity liable for the obligations of a corporation in which the individual or entity holds stock." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991); *see also Bollore S.A. v. Imp. Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) ("The great weight of Texas precedent indicates that, for the alter ego doctrine to apply against an individual under this test, the individual must own stock in the corporation.").[13] To the extent Modulus means to argue that MFE can recover MG's lost profits since *Gardner* is an alter ego of both MFE and MG, *see* Dkt. 195, at 3, the fact that two entities share a sole owner does not compel the conclusion that the two entities are alter-egos of each other.

Even if MFE were MG's alter ego, analogous cases suggest MFE should be unable to use the alter-ego doctrine to recover MG's lost profits. First, NVIDIA points to *In re Southmark Corporation*, where the Fifth Circuit rejected a company's bid to use the alter-ego doctrine to "bring one of [its subsidiary's assets] into its estate so that it may assert a fraudulent transfer action against" a company doing business with the subsidiary. 95 F.3d 53, 1996 WL 459958, at *6 (5th Cir. July 26, 1996). More generally, the Fifth Circuit takes an unfavorable view of attempts to disregard the corporate form when it is advantageous to a party otherwise reaping its benefits. *See, e.g.*, *United States v. M/Y Galactica Star*, 13 F.4th 448, 457-58 (5th Cir. 2021) ("[A] court of equity will not disregard a corporation's exclusive ownership of assets and

[13] "State and federal alter ego tests are essentially the same. [The Fifth Circuit's] non-diversity alter ego cases rarely state whether a state or federal standard controls, and apply state and federal cases interchangeably." *Century Hotels v. United States*, 952 F.2d 107, 110 n.4 (5th Cir. 1992); *see also Chao v. Occupational Safety & Health Review Comm'n*, 401 F.3d 355, 365 n.3 (5th Cir. 2005) (declining to discuss whether state or federal alter ego law applied in case not arising under diversity jurisdiction).

claims where those in control have deliberately adopted the corporate form in order to secure its advantages. This Court therefore declines to allow [the sole shareholder of the corporate owner] to disregard the corporate entity when it is advantageous to [that shareholder] and, on the other hand, benefit from the corporate entity when it wishes." (cleaned up)); *Wilson v. Rollins, Inc.*, 129 F.3d 608, 1997 WL 681024, at *4 (5th Cir. Sep. 29, 1997) ("The Wilsons have not cited any authority allowing them to recover individually for the alleged fraudulent inducement of the sale of *corporate* assets. Indeed, Texas law is to the contrary. … The Wilsons chose to operate their business as a corporation, and they are bound by that choice."); *see also Est. of Vasquez-Ortiz v. Zurich Compania de Seguros, S.A.*, No. H-11-2413, 2013 WL 105005, at *4 (S.D. Tex. Jan. 8, 2013) ("The alter ego doctrine is a sword to be used against a corporation by its creditors, not a sword to be used by the corporation against those who assumed, in good faith, that they were dealing with a corporation and not an individual.").

Thus, even if MFE were MG's alter ego, allowing MFE to pierce the corporate veil to assert a claim for lost profits belonging to MG is improper. MFE fails to put forward any evidence of lost profits,[14] and the District Judge should grant summary judgment in NVIDIA's favor on this point.

---

[14] NVIDIA asks the Court to bar Modulus from relying on fact evidence to prove lost profits given that, according to NVIDIA, MG "elected not to disclose any factual bases to support [MG's] lost profits claim during fact discovery." Dkt. 175, at 10-11 (citing Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.")); *see also* Dkt. 190-13, at 31 (stating Modulus's "lost sales and/or lost profits" had "not yet been calculated"). In response, Modulus points to its interrogatory responses

b. There is no genuine issue of material fact as to whether MG is entitled to legal damages.

i. MG lacks standing to sue for lost profits under section 1114.

MG cannot show it has standing to sue for infringement of the ’560 and ’640 marks. Again, Modulus seeks damages for the period of 2023, 2024, and 2025. The parties agree that a claim for infringement of a registered mark under 15 U.S.C. § 1114 requires a plaintiff to demonstrate it is the mark’s owner or assignee. *See* Dkt. 195, at 5; *Rex Real Est.*, 80 F.4th at 616 (“[O]nly an owner or a true assignee has statutory standing to bring a claim under section 32(1),” codified at 15 U.S.C. § 1114). Modulus alleges that MFE—not MG—owns both registrations and makes no argument that MFE assigned its rights to MG. Dkt. 1, at 13; *see* Dkt. 195. So, NVIDIA moves for summary judgment as to MG’s standing to sue under section 1114 on the grounds that MG is not the marks’ owner or assignee. Dkt. 175, at 15. Modulus responds, with no support, that MG has standing under section 1114 because MG and MFE are “alter egos” of each other via their shared owner, Gardner. Dkt. 195, at 5.

Modulus thus raises no genuine fact issue as to whether it is an owner or assignee of the mark as required to maintain a suit under section 1114. *See id.* Further, the District Judge should reject Modulus’s invitation to create a new theory

---

detailing revenue trends and the parties’ agreement to conduct Gardner’s deposition after the close of discovery. Dkts. 195, at 9-10; 190-13 (showing Modulus’s interrogatory responses); 186-80 (email stating NVIDIA agreed to reschedule Gardner’s deposition). The undersigned finds that, while somewhat sparse, Modulus disclosed enough information during fact discovery such that its fact evidence should not now be excluded. Accordingly, the undersigned will deny NVIDIA’s request. *See Shipes v. Trinity Indus.*, 987 F.2d 311, 323 (5th Cir. 1993) (stating the imposition of discovery sanctions “is a matter of discretion for the district court”).

of standing based on the alter-ego doctrine. First, courts in this Circuit have rejected attempts to manufacture standing based on an alter-ego theory. *See Est. of Vasquez-Ortiz*, 2013 WL 105005, at *4 (declining, in the context of standing to sue under an insurance contract, to "extrapolate from [the alter-ego doctrine] a novel theory of standing"). Second, as the undersigned explained above, Fifth Circuit precedent suggests MG should not be able to reap the benefits of the corporate form but disregard the form when doing so is advantageous. *See, e.g.*, *M/Y Galactica Star*, 13 F.4th at 457-58. The District Judge should grant NVIDIA's motion for summary judgment that MG lacks standing to sue under section 1114.

ii. MG lacks standing to sue for lost profits under section 1125(a).

NVIDIA also asserts that MG lacks standing to sue for infringement under 15 U.S.C. § 1125(a), or Section 43(a),[15] for the period after the marks were registered. The parties agree that section 1125(a) does not require a plaintiff to own the mark but only requires that the party have a protectable interest in the mark. Dkts. 175, at 16; 195, at 6. NVIDIA also does not dispute that MG has a protectable interest in the '560 and '640 marks. *See* Dkt. 175, at 16-17. But NVIDIA argues that because the marks have been registered since 2015 and 2022, MG cannot recover damages for the years 2023, 2024, and 2025, since section 1125(a) creates a cause of action for only *unregistered* marks. Dkt. 175, at 16-17. Modulus responds that non-owners may assert infringement of registered marks under section 1125(a), that is, section 1125(a) is available for infringement claims regardless of registration. Dkt. 195, at 6.

[15] Section 43(a) of the Lanham Act is codified at 15 U.S.C. § 1125.

Therefore, according to Modulus, MG has standing as a non-owner to sue for infringement of the *registered* '560 and '640 marks under section 1125(a) during 2023, 2024, and 2025. *Id.*

The undersigned agrees with NVIDIA that *Rex* bars Modulus from suing under section 43(a) for infringement of registered marks. 80 F.4th at 628; *see* Dkt. 176, at 16. In *Rex*, the Fifth Circuit stated that "[s]ection 32(1) [codified at 15 U.S.C. section 1114] creates a cause of action for infringement of registered marks; [s]ection 43(a) creates a cause of action for infringement of unregistered marks." 80 F.4th at 616; *see also Adler*, 10 F.4th at 426 ("Section 32 creates a cause of action for infringement of registered marks; Section 43 [codified at 15 U.S.C. § 1125(a)] creates a cause of action for infringement of unregistered marks."); *Amazing Spaces*, 608 F.3d at 235 n.8 ("The Lanham Act provides separate causes of action for infringement of a registered mark and an unregistered mark. … The Lanham Act provides a cause of action for infringement of an unregistered mark in [section 1125(a)[.]]"); 4 McCarthy on Trademarks and Unfair Competition § 27:7 (5th ed. 2026) ("Section 43(a) is limited to two types of legal claims: (1) infringement of unregistered marks and trade dress; and (2) false advertising."). Then, the Circuit affirmed the district court's judgment as a matter of law as to plaintiff's section 1114 claims because it did not own the marks. 80 F.4th at 618; *see Rex*, 80 F.4th at 616 ("[O]nly an owner or a true assignee has statutory standing to bring a claim under section 32(1)."). But the Circuit reversed and remanded the court's judgment as a matter of law as to plaintiff's section 1125(a) claim because a reasonable jury could conclude a there was a "probability of

confusion" between the marks. *Id.* at 628. In issuing its instructions to the Court, the Circuit stated

> No reasonable jury could conclude that Plaintiff owned the marks, so we affirm the district court's judgment as a matter of law as to Plaintiff's Section 32(1) claim for alleged infringement of the marks *after federal registration*. However, … a reasonable jury could find in favor of Plaintiff's claim under Section 43(a) for infringement of the marks *before they were federally registered*.

*Id.* (emphasis added). Consistent with its earlier statement that section 1125(a) creates a cause of action for infringement of unregistered marks, the Circuit's decision effectively limited the section 1125(a) claims to the period in which the mark was unregistered. *See id.*; *see also Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, No. 23-50889, 2024 WL 4481850, at *1 (5th Cir. Oct. 14, 2024) ("We affirmed the district court's ruling on Rex I's trademark claims that arose after those marks were federally registered, but reversed and remanded for a new trial on Rex I's claims that arose before federal registration.").

Since *Rex*, courts in this circuit have declined to recognize a cause of action for infringement of a registered trademark under section 1125(a). *See, e.g.*, *Wearable Shoe Tree, LLC v. Does 1-601*, No. 4:24-CV-334-SDJ, 2025 WL 872524, at *4 (E.D. Tex. Mar. 20, 2025) (declining to address plaintiff's section 1125(a) claim for infringement of registered marks in determining whether plaintiff was entitled to a default judgment); *Luxottica of Am. Inc. v. Brave Optical, Inc.*, No. 4:22-CV-244, 2024 WL 7052701, at *8 (E.D. Tex. Jan. 10, 2024) (stating that while section 32(1) creates a cause of action for infringement of "*registered*" marks, section 1125(a) "creates a cause of action for infringement of *unregistered* marks" (internal quotation marks

omitted) (emphasis original)); *id.* at *10 n.2 ("The Court notes that it is questionable whether Luxxotica can properly assert an unfair competition claim under Section 43(a) of the Lanham Act, given the claim rests on registered, rather than unregistered, trademarks."); *but see Am. Auto. Ass'n, Inc. v. Saga Int'l, Inc.*, ---- F. Supp. 3d ----, 2025 WL 4350756, at *3 (S.D. Tex. Dec. 8, 2025) ("Section 1125(a)(1)(A) similarly prohibits unfair competition, including false designation of origin, with respect to registered *and* unregistered trademarks." (emphasis original)). The undersigned agrees with NVIDIA that Modulus cannot sue for infringement of the registered '560 and '640 marks under section 1125.

Modulus's Fifth Circuit citations are not to the contrary, as none of those cases addressed whether a non-owner could maintain a section 1125(a) infringement claim based on a registered mark. In *Reed v. Marshall*, the Fifth Circuit affirmed summary judgment in defendant's favor on a section 1125(a) claim based on a registered mark because the defendant's use of the mark, as a co-owner, was authorized, but did not comment on whether such a claim was proper. 142 F.4th 338, 350 (5th Cir. 2025). In *Lettuce Entertain You Enterprises, Inc. v. Hotel Magdalena Joint Venture, LLC*, the Circuit remanded plaintiff's claims based on a registered mark for reconsideration of the digits of confusion where plaintiff brought claims under both section 1114 and section 1125(a). No. 23-50319, 2024 WL 3274787, at *1, *6 (5th Cir. July 2, 2024).

Since Modulus may only sue for infringement of unregistered marks under section 1125(a), and the marks were registered in 2015 and 2022, its claim for legal damages for the period of 2023, 2024, and 2025 fails.[16]

3. The District Judge should deny NVIDIA's motion for summary judgment as to equitable relief.

There is a genuine issue of material fact as to whether Modulus is entitled to equitable relief. In addition to legal damages, Modulus requests an injunction and disgorgement of profits associated with NVIDIA's NVAIE, an NVIDIA product that affords subscribers technical support services and access to software including the physics toolkit. Dkts. 1, at 18; 169-5, at 7; *see* Dkt. 169-18, at 40, 47 (describing NVAIE). The Lanham Act permits plaintiffs to recover defendants' profits in some cases based on two considerations. 15 U.S.C. § 1117(a). First, "[a] court considers six non-exclusive factors in determining whether an award of profits is appropriate: (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Retractable I*, 842 F.3d at 900 (internal quotation marks omitted).[17] Second, courts consider whether the defendant's profits are attributable to the alleged violation.

---

[16] Because the undersigned determines MG lacks standing to seek lost profits, the undersigned does not reach the question whether there is any evidence of MG's lost profits in the record. *See* Dkt. 175, at 11.

[17] Though *Retractable* involved claims for false advertising, disgorgement is available in trademark-infringement suits, as well. *See, e.g.*, *Trojan Battery Co., LLC v. Golf Carts of Cypress, LLC*, 175 F.4th 582, 599 (5th Cir. 2026).

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019) [hereinafter *Retractable II*]; *see also Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 544 (5th Cir. 1998). The undersigned addresses each factor in turn before addressing attributability.

a. Weighing the factors, there is evidence that disgorgement may be proper.

i. There is no evidence of palming off.

There is no evidence NVIDIA engaged in "palming off." "Palming off occurs when a producer misrepresents his own goods and services as someone else's." *Streamline*, 851 F.3d at 462 n.9. "[A] plaintiff who cannot demonstrate … palming off faces an uphill battle in obtaining disgorgement." *Retractable II*, 919 F.3d at 882. Yet palming off is "not a prerequisite" to a disgorgement award. *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992).

NVIDIA points to evidence that it consistently referred to its product as "NVIDIA Modulus," and that any use of the term "Modulus" was preceded by an earlier reference to NVIDIA. Dkts. 169-21 (webpage titled "NVIDIA Modulus"); 169-22 (webpage titled "NVIDIA Modulus: Getting Started" with later use of "Modulus"); 169-23, at 88 (Shah testifying that "in the first reference of the product, NVIDIA comms always mentions NVIDIA product name as NVIDIA Modulus"). NVIDIA also points out that no customer purchasing NVAIE would mistake it for a Modulus product given the acronym stands for "NVIDIA AI Enterprise" and includes the "NV" reference to NVIDIA. Dkt. 169-33 (NVIDIA webpage describing "NVIDIA AI Enterprise"). And NVIDIA asserts no customer would confuse NVAIE for Modulus's

product because NVAIE's customers must enter contracts with NVIDIA to subscribe. Dkt. 169-18, at 21 (Tjernlund noting purchasers of NVAIE must accept NVIDIA license terms).

In response, Modulus emphasizes that "palming off is not a prerequisite for a finding of disgorgement." Dkt. 194, at 20 (citing *Tex. Pig Stands*, 951 F.2d at 697 (stating that "while [palming off] is not a prerequisite to finding unjust enrichment, it is an important circumstance bearing on the determination")). Modulus argues there is evidence of palming off because NVIDIA announced its product had protein-folding capabilities and NVIDIA "changed to an open-source license only after realizing the financial industry would be interested in" its product. Dkt. 194, at 20; *see* Dkt. 166-17, at 217-18 (Roberts discussing he would not have done business with Gardner if he had made Modulus open-sourced). This evidence does not suggest that NVIDIA misrepresented its goods and services as Modulus's. *See Streamline*, 851 F.3d at 462 n.9. The "palming off" factor weighs against disgorgement.

ii. There is some evidence suggesting sales were diverted.

There is some evidence of diverted sales in the record. As with palming off, a plaintiff who cannot demonstrate diversion of sales faces "an uphill battle in obtaining disgorgement." *Retractable II*, 919 F.3d at 882. But "evidence of diverted sales is not necessary for a district court to award disgorgement under the Lanham Act." *Trojan*, 175 F.4th at 600.

In support of its motion, NVIDIA points out that Modulus's damages expert, Clemons, stated that "Plaintiffs are not arguing that NVIDIA harmed Plaintiffs by

selling a competing product that directly captured sales that would have otherwise gone to Plaintiffs." Dkt. 169-20, at 10. NVIDIA adds that its physics toolkit is free and thus could not have diverted any sales from Modulus. Dkts. 176, at 10; 169-21 ("NVIDIA Modulus" webpage stating "Modulus is an open-source, freely available AI framework for developing physics-ML models"). NVIDIA asserts Modulus's sales also could not have been diverted to NVAIE because it is "implausible" that any NVIDIA customers mistook NVAIE for Modulus given its name, price, and the fact that it is a subscription service with hundreds of software offerings in addition to the physics toolkit. *See* Dkts. 169-18, at 12-13 (noting NVAIE "support[s] currently several hundred components"); 169-24, at 17 (showing a one-year subscription to NVAIE costs $4,500).

Additionally, NVIDIA asserts "it would have made no sense for a potential customer seeking a financial exchange solution to purchase customer support for a physics toolkit via NVAIE." Dkt. 176, at 11-12; *see* Dkts. 169-7, at 245 (Gardner agreeing that from 2021 until 2025, Modulus's "primary source of revenue was sales of the exchange solution to crypto exchanges"); *id.* at 570-71 (Gardner stating "most of" Modulus's clients "wouldn't know what they're looking at" if they downloaded and started using NVIDIA PhysicsNeMo and that he "would assume" that "100 percent of [Modulus's] potential customers would not be able to create an exchange using NVIDIA PhysicsNeMo software"). NVIDIA also argues that despite NVAIE's providing customer support for hundreds of software offerings in addition to the physics toolkit, there is no evidence that any customer bought a subscription to

NVAIE due to NVIDIA's use of "NVIDIA Modulus." Dkt. 176, at 11; 169-6, at 78-79 (Clemons stating he does not know of any customer who subscribed to NVAIE because "they liked the name NVIDIA Modulus," but qualifying that this information was not a "relevant input" to his analysis).

In response to NVIDIA's arguments that it cannot have reaped any profits from the free physics toolkit, Modulus emphasizes that evidence of competition and diverted sales is not required for disgorgement. Dkt. 194, at 11; *see Trojan*, 175 F.4th at 600 ("[E]vidence of diverted sales is not necessary for a district court to award disgorgement under the Lanham Act."); *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980) ("[A]n accounting is proper even if the defendant and plaintiff are not in direct competition, and the defendants' infringement has not diverted sales from the plaintiff."). Then, Modulus points to evidence that there is some overlap in the markets for NVIDIA's physics toolkit and Modulus's product. Specifically, NVIDIA marketed NVIDIA Modulus to financial services companies, an industry Modulus has worked with, and NVIDIA Modulus competes with Modulus software offerings other than financial-exchange solutions, including "physics-informed modeling," artificial intelligence, and "digital twins." Dkt. 194, at 11-13; *see* Dkts. 166-5, at 299-300 (Cherukuri agreeing NVIDIA has discussed applications of AI models for financial services during the period the product was named NVIDIA Modulus); 166-4, at 150-51 (Gould stating an NVIDIA partner "did a digital twin" using NVIDIA Modulus); 166-6, at 112 (Gardner stating that "[t]here's been a lot" of companies or people who have used Modulus's Evo2 software to perform physics-

informed modeling, though he could not recall any specific names); *id.* at 65-66 (Gardner stating he "believe[d]" charting software Modulus provided to NASA could build digital twins); 166-9, at 671 (Gardner stating the "description of goods associated with Modulus" included "artificial intelligence"); *id.* at 744-45 (Gardner agreeing potential applications of Evo2 include protein folding, among others); 166-11, at 63 (Shah noting NVIDIA conducted meetings with customers interested in using NVIDIA Modulus for protein formulation work); *id.* at 138-39 (Shah noting NVIDIA modulus was marketed for "digital twins, climate science, and protein engineering"); *but see* Dkt. 166-6, at 67 (Gardner agreeing he "never marketed Modulus' neural network for creating digital twins"). There is also evidence that Modulus provided a "digital twin simulating capable AI" to two clients who later went on to use NVIDIA's technology. Dkt. 166-6, at 92-94 (Gardner stating he licensed neural networks to Shell and Oak Ridge National Laboratory in 2002 and that they "would have needed additional training to be able to build digital twins"); 166-14, at 10 (Oak Ridge representative stating it started using NVIDIA Modulus in 2024); Dkt. 166-15, at 12-13 (stating that Shell has used NVIDIA Modulus). And Modulus further contends that evidence of Bailey, Roberts, and LeBlanc's actual confusion suggests "there were more instances of actual confusion not captured" which led to diverted sales. Dkt. 194, at 14.

NVIDIA counters that this evidence cannot create a fact issue as to diverted sales given the thin evidence that Modulus and NVIDIA's markets overlapped. Dkt. 222, at 4; *see* Dkt. 169-7, at 112 (Gardner stating he could not name any company or

person other than one, Craig Fletcher, who had used neural network hardware to perform physics-informed modeling); *id.* at 127 (Gardner agreeing the primary use of Evo2 is in trading systems); *id.* at 655 (Gardner agreeing Modulus's AI software could not perform certain functions related to surrogate models). NVIDIA also takes issue with Modulus's assertion that it sold software for building digital twins. *See* Dkt. 169-7, at 68 (Gardner agreeing the goal was to provide NASA with "very, very simple charting software"); 166-15, at 13-14 (Shell representative stating he had never heard of MFE or MG); 214-8, at 13 (Oak Ridge corporate designee stating he had not heard of MFE, MG, or Gardner). NVIDIA further contends that none of Modulus's instances of actual confusion led to any diverted sales. Dkt. 222, at 4-5; *see* Dkts. 168-6, at 67 (Clemons stating it is "[his] understanding" that "no harm resulted" from Mr. Roberts's and Mr. Bailey's confusion); 168-19, at 2 (email from Gardner stating there was "no damage" as a result of Roberts's alleged confusion); 168-8, at 53 (Gardner agreeing LeBlanc "was not specifically looking to do business with [Modulus] before [an AI model] mistook" NVIDIA Modulus for Modulus).

Though NVIDIA doubtless presents contradicting evidence, viewing the evidence in the light most favorable to Modulus, the undersigned finds there is a fact issue as to diverted sales. First, Modulus points to evidence that there is some overlap in the markets for each party's product, suggesting there may be competition. *Cf. Maltina*, 613 F.2d at 584-85 (discussing competition as a factor in weighing plaintiff's entitlement to a defendant's profits). That Gardner could name only one customer who used Modulus for physics-informed modeling, or that Modulus's *primary* market

is financial technology, do not support a finding that Modulus is not entitled to disgorgement as a matter of law at this stage. Second, the evidence that Modulus sold products to Shell and Oak Ridge only for those companies to later purchase NVIDIA Modulus suggests NVIDIA may have captured sales that would have gone to Modulus. And the undersigned cannot conclude that Modulus cannot win disgorgement as a matter of law because individual corporate representatives at those companies had not personally heard of Modulus. These questions are best given to the jury.

iii. There is some evidence suggesting intent to deceive.

Modulus points to evidence suggesting NVIDIA had intent to confuse or deceive. NVIDIA asserts it picked the name "Modulus" because of the word's association with "model building." Dkt. 176, at 13; *see* Dkt. 169-15, at 86 (Gould explaining that NVIDIA chose the name "Modulus" because it is "easier to explain to somebody that Modulus is a model builder, as opposed to explaining that SimNet was a model builder"). In response, Modulus points to discussions among NVIDIA leadership about whether to adopt the Modulus name given its usage by an NVIDIA partner. Dkt. 166-59 (Gould email asking NVIDIA leadership whether "we learned a lesson not necessary to repeat by grabbing a name used by a partner"); *id.* ("I see clear roads on the other 3 [names] that Jensen chose over."); *but see* Dkt. 166-4, at 206-07 (Gould stating, "I personally took it as a valuable lesson to learn to try to check some other databases before we wasted legal's time doing trademark searches. Because we might be able to rule out names we couldn't, shouldn't use, quicker."). Additionally,

Modulus points out that NVIDIA still uses the Modulus mark. *See, e.g.*, Dkt. 186-5, at 15 (showing a thumbnail of a video titled "Accelerating Simulations of Multiscale Chemical Reactors using NVIDIA Modulus" under the heading "NVIDIA PhysicsNeMo Featured Content").

NVIDIA correctly asserts that mere awareness of a senior user's mark is insufficient to establish bad intent. Dkt. 222, at 6; *see Streamline*, 851 F.3d at 456. Therefore, evidence that NVIDIA leadership knew about the Modulus mark and discussed avoiding using the Modulus name because it belonged to a partner does not suggest NVIDIA chose the mark with intent to confuse or deceive. But Modulus presents evidence that NVIDIA expanded into financial services after adopting the Modulus mark, suggesting that regardless of its original intent, NVIDIA may have used the mark in a way that later evidenced an intent to trade on Modulus's reputation. Dkt. 194, at 8-9; *see* Dkts. 186-32 (suggesting that a program called FCN+Modulus "could be interesting for hedge funds and trading firms"); 166-5, at 299-300 (Cherukuri agreeing NVIDIA has discussed applications of AI models for financial services during the period the product was named NVIDIA Modulus); *Streamline*, 851 F.3d at 456 ("We have also found intent to confuse when the defendant did not choose the mark with intent to confuse but subsequently used the mark in a way that evidenced an intent to trade on the senior user's reputation." (internal quotation marks omitted)). Whether this evidence demonstrates an intent to deceive is best left to the jury.

Further, though NVIDIA asserts any lingering use of the Modulus mark is innocuous because NVIDIA first identifies the content as "NVIDIA PhysicsNeMo," whether that use constitutes intent to deceive is also a question for the jury. *See* Dkt. 222, at 7-8.

iv. There is some evidence alternate remedies are inadequate.

Alternative remedies have not necessarily resolved Modulus's infringement claims. NVIDIA argues that given it has already changed the product's name to PhysicsNeMo, Modulus's infringement claims have already been remedied. Dkt. 176, at 15-16; *see* Dkt. 169-17 (webpage stating "NVIDIA Modulus has been renamed to NVIDIA PhysicsNeMo"). Modulus asserts that an injunction against NVIDIA's use of the Modulus mark will not adequately deter NVIDIA given its willful infringement. Dkt. 194, at 16 (citing *Maltina*, 613 F.2d at 585). In *Maltina*, the Fifth Circuit concluded that given the defendant's willful infringement, "[a]n injunction alone [would] not adequately deter future infringement." 613 F.2d at 585. Because, as discussed above, there is some question as to NVIDIA's willful infringement here, whether NVIDIA's—allegedly incomplete—cessation of use of the Modulus mark means alternative remedies have resolved Modulus's claims is a question for the jury.

v. There is evidence suggesting Modulus promptly filed suit.

NVIDIA argues Modulus's delay in filing suit was unreasonable given that Modulus "at a minimum delayed a full year between finding out about NVIDIA's use of 'NVIDIA Modulus' in April 2023 and filing suit in April 2024." Dkt. 176, at 16

(citing *Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 619 (S.D. Tex. 2014) (concluding that a delay of "nearly three years" before filing suit to enjoin defendants' use of the mark counseled against an award of damages)); *see* Dkt. 169-31 (email from Gardner admitting a prospective customer "might have made [him] somewhat aware of NVIDIA a year before and I forgot about it"). Modulus presses that it did not delay in filing suit, citing evidence that Gardner did not know about the alleged infringement until 2024. Dkt. 166-9, at 787 (Gardner stating he didn't know about NVIDIA's use of "Modulus" until 2024). Even if Modulus knew about NVIDIA's use of the mark in 2023, NVIDIA points to no case concluding that a one-year delay in filing is unreasonable. Whether such a delay is unreasonable is a question for the jury.

vi. The public interest is neutral.

Finally, NVIDIA argues that the public interest would not be served by awarding disgorgement given NVIDIA Modulus is a free product and NVAIE does not bear the mark. Dkt. 176, at 17. Modulus asserts the public interest favors disgorgement since NVIDIA "should not be allowed" to "solve its naming problems by taking" the mark or "successfully market[ing] to the financial services industry." Dkt. 194, at 19-20; *see* Dkt. 166-12, at 97 (Tjernlund stating "I have heard about customer references in the automotive and financial services industries"); *id.* at 100-101 (Tjernlund agreeing a subscription is required to access certain NVIDIA Modulus-related programs). Modulus also argues the public interest favors disgorgement because of the "permanent state of association between Modulus and NVIDIA" due to the alleged infringement. *Id.* at 20 (citing Dkt. 166-6, at 159 (Gardner stating "I

missed the whole run-up with AI. And I feel like I lost it all.”)). Neither party cites any evidence suggesting this factor should weigh heavily in the analysis. Accordingly, the undersigned finds this factor is neutral.

Given that Modulus identifies issues of fact pertaining to multiple disgorgement factors, the undersigned recommends that the District Judge deny NVIDIA’s motion for summary judgment as to disgorgement.

b. There is a genuine issue of material fact as to whether NVIDIA’s profits are attributable to the alleged infringement.

As stated above, “[o]nce an award [of disgorgement] is found to be appropriate, a markholder is only entitled to those profits attributable to the unlawful use of its mark.” *Pebble Beach*, 155 F.3d at 554. NVIDIA asserts disgorgement is improper because there is no causal link between the physics toolkit and NVIDIA’s sales given that the toolkit is free. Dkt. 176, at 17; *see* Dkts. 169-21 (“NVIDIA Modulus” webpage stating “Modulus is an open-source, freely available AI framework for developing physics-ML models”); 169-32 (“NVIDIA PhysicsNeMo” webpage stating “NVIDIA PhysicsNeMo is an open-source Python framework for building, training, and fine-tuning physics AI models at scale”). With respect to sales of NVAIE, which includes access to the physics toolkit, NVIDIA argues that there is no evidence that its temporary use of the name “NVIDIA Modulus” “caused any increased sales of NVAIE.” Dkt. 176, at 18; *see* Dkt. 169-6, at 78-79 (Clemons stating he does not know of any customer who subscribed to NVAIE because “they liked the name NVIDIA Modulus,” but qualifying that this information was not a “relevant input” to his

analysis); *id.* at 77-78 (Clemons responding that he was "not aware" of "any specific person who expressed interest in NVIDIA's product because of the name NVIDIA Modulus," but qualifying that "that wasn't part of [his] analysis").

Modulus responds that NVIDIA may have benefited financially from its use of the Modulus mark regardless of whether it distributed the software for free because certain NVIDIA partners "came on board" after NVIDIA adopted the Modulus name. *See* Dkt. 166-4, at 150 (Gould agreeing that certain NVIDIA partner companies "were not all on board because they had problems with the SimNet name" and became partners after the name change). Modulus also points to testimony from Tjernlund that an NVAIE subscriber submitting a problem ticket was "still calling the framework Modulus in the late August 2025 time period," which Modulus argues demonstrates NVIDIA's success is attributable to use of the mark. Dkt. 166-12, at 112-13; *see* Dkt. 166-97 (ticket stating "unable to pull modulus container from ngc").

Modulus's evidence is enough to create a fact issue here. The attribution requirement "ensures that once the district court has determined disgorgement is equitable, a *defendant* will only be forced to disgorge profits attributable to the Lanham Act violation." *Retractable II*, 919 F.3d at 878 (emphasis in original). In *Retractable II*, the Fifth Circuit affirmed attributability where the plaintiff presented evidence that the defendant benefitted from its false advertising by "commanding premium pricing—generating increased profits for [defendant] without necessarily diverting sales from" plaintiff. *Id.* Similarly, Modulus's evidence that NVIDIA gained partners because of adopting the Modulus name suggests NVIDIA's profits may be

attributable to the alleged infringement. The District Judge should decline to grant summary judgment on the basis that NVIDIA's profits are not attributable to the alleged infringement.

c. There is a genuine issue of material fact as to whether Modulus is entitled to injunctive relief.

NVIDIA finally asserts that Modulus is not entitled to an injunction because NVIDIA no longer uses the mark and there is no reasonable concern that it will do so in the future. Dkt. 176, at 18 (citing *Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 F. App'x 803, 805 (5th Cir. 2020) (affirming summary judgment on no injunctive relief where the defendant "immediately stopped using the mark and ha[d] not resumed using it"). As discussed above, Modulus presents some evidence that NVIDIA continues to use the mark. *See, e.g.*, Dkt. 186-5, at 15 (showing a thumbnail of a video titled "Accelerating Simulations of Multiscale Chemical Reactors using NVIDIA Modulus" under the heading "NVIDIA PhysicsNeMo Featured Content"). Whether that alleged continuing use entitles Modulus to an injunction should be a question for the jury.

## IV. ORDER AND RECOMMENDATIONS

In accordance with the above discussion, the undersigned **ORDERS** that NVIDIA's motion to exclude the expert opinion of Alexander Clemons, Dkt. 174, is **GRANTED**.

The undersigned **ORDERS** that Modulus's motions to exclude the expert reports of Itamar Simonson and Shawn Olds are **DISMISSED AS MOOT** without prejudice. Dkts. 171; 172.

The undersigned **RECOMMENDS** that the District Judge **DENY** Modulus's motion for summary judgment, Dkt. 173.

The undersigned **FURTHER RECOMMENDS** that the District Judge **GRANT** NVIDIA's motion for summary judgment as to Modulus's requests for legal damages, Dkt. 175.

The undersigned **FINALLY RECOMMENDS** that the District Judge **DENY** NVIDIA's motion for summary judgment as to Modulus's requests for equitable relief, Dkt. 176.

The referral of this case to the undersigned should now be canceled.

## V. WARNINGS

The parties may file objections to this report and recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Judge need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after the party is served with a copy of the report shall bar that party from *de novo* review by the District Judge of the proposed findings and recommendations in the report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED August 11, 2026.

DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE